**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ROBERT E. MURRAY, et al.,**

       **Plaintiffs,**

                              **Case No. 2:13-cv-1066**

     **v.**                       **JUDGE GREGORY L. FROST**

                                     **Magistrate Judge Terence P. Kemp**

**THE HUFFINGTONPOST.COM, INC., et al.,**

       **Defendants.**

## OPINION AND ORDER

This matter is before the Court for consideration of the following filings:

(1) a motion to dismiss (ECF No. 19) filed by Defendant Wilfred Michael Stark III ("Stark"); a memorandum in opposition (ECF No. 25) filed by Plaintiffs Robert E. Murray and Murray Energy Corporation; and a reply memorandum (ECF No. 29) filed by Stark; and

(2) a motion to dismiss (ECF No. 20) filed by Defendants The HuffingtonPost.com, Inc., Arianna Huffington, Roy Sekoff, Stuart Whatley, and Jason Cherkis ("The Huffington Defendants"); a memorandum in opposition (ECF No. 26) filed by Plaintiffs; and a reply memorandum (ECF No. 30) filed by the Huffington Defendants.

For the reasons that follow, the Court **GRANTS** the motions to dismiss.  (ECF Nos. 19, 20.)

## I.  Background

On the plaintiffs' side of this litigation is Robert E. Murray and Murray Energy Corporation.  Murray is the President, Chief Executive Officer, and Chairman of the company, which is an Ohio corporation.  On the defendants' side of the case is TheHuffingtonPost.com, Inc., a Delaware media company that operates the website The Huffington Post, and various

employees or contributors: The Huffington Post President and Editor-in-Chief Arianna Huffington, Editor Roy Sekoff, Executive Blog Editor Stuart Whatley, news reporter Jason Cherkis, and independent contractor and contributor Wilfred Michael Stark III. These parties are at odds over an online article that The Huffington Post published in September 2013 titled "Meet the Extremist Coal Baron Bankrolling Ken Cuccinelli's Campaign." The article, which appeared with the byline "Mike Stark, Journalist," reads in its entirety as follows:[1]

> Ken Cuccinelli, the Tea Party/GOP candidate for governor in Virginia, is struggling to save his campaign from a pair of slow-moving – but unrelenting – scandals that cast doubt upon his character and integrity.
>
> To be clear, neither of these scandals are Whitewater-esque: There really is a "there" there. Cuccinelli really did accept thousands of dollars in gifts from the CEO of Star Scientific. He bought and sold stock in the company, and failed to report the transactions as required by law. He did all of this while holding office as Virginia's Attorney General. And he did all of this at a time he was legally obligated to defend against a lawsuit Star Scientific filed against the Commonwealth of Virginia.
>
> (As an aside, imagine learning your divorce lawyer concealed that she had accepted thousands of dollars from your ex-spouse while the case was pending. That's very similar to what we have here.)
>
> While Cuccinelli was literally in [sic] sleeping in Star Scientific's bed, he was also using the power of his office to benefit a Pennsylvania coal and gas company, Consol Energy. Beginning in 2010, Cuccinelli (and other lawyers in his office) took steps to help Consol avoid paying coal-bed methane royalties owed to Virginia landowners. Here again, the money trail is damning. Over the first seven years of Cuccinelli's political career, Consol contributed a total of $3,500 to Cuccinelli's various campaigns. In contrast, in the three years Cuccinelli has been using his AG office to benefit Consol, they're given his campaigns more than $140,000.
>
> One might think that an embattled politician struggling to overcome the headwinds of scandal would be cautious before accepting fat envelopes of cash from extreme and unsavory donors.

---

[1] There is some dispute as to whether Jason Cherkis assisted in the article. Because the author of the article is not important under the dispositive analysis discussed herein, the Court shall for ease of reference simply refer to Stark as the author.

Not Cuccinelli.

According to Cuccinelli's most recent campaign finance filing, his most generous individual contributor (and largest donor after the Republican Governors Association), is Murray Energy Corporation.  Less than a month ago, on Aug. 27, Cuccinelli took $30,000.

Robert "Bob" Murray owns Murray Energy Corporation.  He has a history.

Most recently, he was the keynote speaker at the Bluefield Coal Show.  He told the audience, "Many prominent Americans are now discussing the need to impeach President Obama."  He unveiled a sign that read "Save America Impeach Obama" and asked people on the room if they wanted to be part of the effort.

In September 2012, Mitt Romney gave a campaign speech in Ohio.  Scores of coal miners, easily identified by their overalls, boots and safety gear, formed the backdrop as Romney derided "Obama's War on Coal."  Romney nodded toward Murray and added, "I tell ya, you've got a great boss.  He runs a great operation here."

The next day the world learned that the miners standing behind Romney went without pay that day because Murray closed his mine – and "communicated to [the miners] that the attendance at the Romney event was mandatory."

Just weeks later Barack Obama was reelected in a landslide.

Bob Murray responded with a prayer:

> "Dear Lord:
>
> The American people have made their choice.  They have decided that America must change its course away from the principals [*sic*] of our Founders.  And, away from the idea of individual freedom and individual responsibility.  Away from capitalism, economic responsibility, and personal acceptance.
>
> We are a Country in favor of redistribution, national weakness and reduced standard of living and lower and lower levels of personal freedom.
>
> My regret, Lord, is that our young people, including those in my own family, never will know what America was like or might have been.  They will pay the price in their reduced standard of living and, most

3

especially, reduced freedom.

The takers outvoted the producers.  In response to this, I have turned to my Bible and in II Peter, Chapter 1, verses 4-9 it says, 'To faith we are to add goodness; to goodness, knowledge; to knowledge, self control; to self control, perseverance; to perseverance, godliness; to godliness, kindness; to brotherly kindness, love.'

Lord, please forgive me and anyone with me in Murray Energy Corp. for the decisions that we are now forced to make to preserve the very existence of any of the enterprises that you have helped us build.  We ask for your guidance in this drastic time with the drastic decisions that will be made to have any hope of our survival as an American business enterprise.

Amen."

With that, Murray announced he was firing more than 150 of his miners.

Firing so many employees may well have been the fulfillment of a promise.

". . . a review of letters and memos to Murray employees, suggest that coercion may also explain Murray staffers' financial support [. . .] Murray, it turns out, has for years pressured salaried employees to give to the Murray Energy political action committee (PAC) and to Republican candidates chosen by the company.  Internal documents show that company officials track who is and is not giving.  The sources say that those who do not give are at risk of being demoted or missing out on bonuses, claims Murray denies.

The Murray sources, who requested anonymity for fear of retribution, came forward separately.  But they painted similar pictures of the fund-raising operation.  'There's a lot of coercion,' says one of them.  'I just wanted to work, but you feel this constant pressure that, if you don't contribute, your job's at stake.  You're compelled to do this whether you want to or not."  Says the second: 'They will give you a call if you're not giving . . .  It's expected you give Mr. Murray what he asks for.'

[. . .]

A September 2010 letter [*Exhibit B, the last page of the PDF file*] lamenting insufficient contributions to the company PAC is more pointed.  **'The response to this letter of appeal has been poor,' Murray writes.  'We have only a little over**

4

**a month left to go in this election fight. If we do not win it, the coal industry will be eliminated and so will your job, if you want to remain in this industry."**

So that's Cuccinelli's largest individual donor from the last cycle. $30,000 from an extremist billionaire that is funding an Obama impeachment effort, that allegedly extorts money from his low-wage employees, and fires his workforce wholesale in fits of spite when electoral results disappoint him.

In light of Consol and Star Scientific scandals, Murray's status as the largest individual donor to Cuccinelli's campaign should raise questions in Virginia: What does Bob Murray expect in return for his investment? (It's worth noting that Murray Energy has no mining presence in Virginia.) What promises has Cuccinelli made to Murray Energy and Bob Murray? Does Murray Energy have any pending business before the state of Virginia? Does Bob Murray have any business before the Office of the Attorney General?

(ECF No. 16-1, at Page ID # 135-36.)

Following publication of this article, Plaintiffs filed an action in the Court of Common Pleas of Belmont County, Ohio. Defendants removed the action to this Court on October 25, 2013. (ECF No. 1.) Via a two-count amended complaint, Plaintiffs assert claims under Ohio law for defamation and for false light invasion of privacy. (ECF No. 16 ¶¶ 34-62.) Defendant Stark has filed a motion to dismiss (ECF No. 19), as have the Huffington Defendants (ECF No. 20). The parties have completed briefing on the motions, which are ripe for disposition.[2]

## II. Discussion

### A. Standard Involved

---

[2] In their briefing, Defendants request oral argument on their motions. Pursuant to the Local Civil Rules, parties may apply to the Court for oral argument if "oral argument is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." S.D. Ohio Civ. R. 7.1(b)(2). "If the Court determines argument or a conference would be helpful, the Court will notify all parties." *Id.* Whether to grant or deny a request for oral argument is left to the sound discretion of the trial court. Because the Court finds that oral argument is not essential to the fair resolution of the motions to dismiss, this Court **DENIES** the requests for oral argument.

Defendants move for dismissal on the grounds that Plaintiff has failed to set forth claims upon which this Court can grant relief.  This Federal Rule of Civil Procedure 12(b)(6) argument requires the Court to construe the amended complaint in Plaintiffs' favor, accept the factual allegations contained in that pleading as true, and determine whether the factual allegations present any plausible claim.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007).  The Supreme Court has explained, however, that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Consequently, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

To be considered plausible, a claim must be more than merely conceivable.  *Twombly*, 550 U.S. at 556; *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007).  What this means is that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level . . . ."  *Twombly*, 550 U.S. at 555.  *See also Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008).

### B.  Analysis

Count One of the amended complaint asserts a claim for defamation.  The elements of a defamation claim under Ohio law are (1) a false and defamatory statement; (2) about the plaintiffs; (3) published without privilege to a third party; (4) with fault or at least negligence on

6

the part of the defendants; (5) that was either defamatory per se or caused special harm to the

plaintiffs.  *Thomas v. Cohr, Inc.*, 197 Ohio App.3d 145, 2011–Ohio5916 ¶ 24, 966 N.E.2d 915.

      Count Two of the amended complaint asserts a claim for false light invasion of privacy.

Ohio law provides that

> one who gives publicity to a matter concerning another that places the other before
> the public in a false light is subject to liability to the other for invasion of his privacy
> if (a) the false light in which the other was placed would be highly offensive to a
> reasonable person, and (b) the actor had knowledge of or acted in reckless disregard
> as to the falsity of the publicized matter and the false light in which the other would
> be placed.

*Welling v. Weinfeld*, 113 Ohio St.3d 464, 473, 866 N.E.2d 1051, 1059 (2007).

      Defendants argue that dismissal of both claims is warranted on the grounds that the

article does not contain false statements of fact, does not mislead the reader, and does not place

Plaintiffs in a false light.  Plaintiff opposes the motions on the grounds that the article's

statements regarding Murray do not fall within the scope of protected opinion.  The dispute

necessitates turning to Ohio law.

      The Sixth Circuit has explained the inquiry, mandated by the applicable state law, that

governs the requisite analysis:

>       The United States Supreme Court does not recognize "a wholesale
> defamation exemption for anything that might be labeled 'opinion.' "  *Milkovich v.*
> *Lorain Journal Co.*, 497 U.S. 1, 18, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).
> However, "[t]he Ohio Constitution provides a separate and independent guarantee
> of protection for opinion ancillary to freedom of the press."  *Vail v. The Plain Dealer*
> *Publ'g Co.*, 72 Ohio St.3d 279, 649 N.E.2d 182, 185 (1995).  To determine whether
> a statement constitutes protected opinion or actionable fact, courts consider the
> totality of the circumstances, including factors such as: (1) "the specific language
> used"; (2) "whether the statement is verifiable"; (3) "the general context of the
> statement"; and (4) "the broader context in which the statement appeared."  *Id.*

*Bentkowski v. Scene Magazine*, 637 F.3d 689, 693-94 (6th Cir. 2011).  This Court shall discuss each

factor in turn.

### 1. Specific language

Under the first factor, this Court must review each alleged actionable statement and " 'determine whether the allegedly defamatory statement has a precise meaning and thus is likely to give rise to clear factual implications.' " *Bentkowski*, 637 F.3d at 694 (quoting *Wampler v. Higgins*, 93 Ohio St.3d 111, 127-28, 752 N.E.2d 962, 978 (2001)). This analysis entails consideration of "the common usage or meaning of the allegedly defamatory words themselves." *Wampler*, 93 Ohio St.3d at 127, 752 N.E.2d at 978. Thus, for example, an accusation of a crime would constitute an actionable statement, while indefinite or ambiguous statements would in most contexts not constitute an actionable statement. *Id.* at 128, 752 N.E.2d at 978.

Plaintiffs argue that the article presents an actionable statement by implying that Murray fired more than 150 miners as a result of President Obama's reelection. This Court agrees that the article draws a connection between the election result and the terminations, stating that the dismissals "may well have been the fulfillment of a promise" and that Murray "fires his workforce wholesale in fits of spite when electoral results disappoint him." The Court disagrees, however, with the proposition that these statements and their apparent implication are actionable. Similar to the article in *Bentkowski*, the article at issue here "does not expressly state or clearly imply" that the subject of the article acted with an illicit motive. 637 F.3d at 694. Rather, the article engages in conjecture that Murray may have acted out of spite, which begs the response of: *so what?* Regardless of whether the intended implication is that Murray is a man of his word or a spoiled individual mired in pettiness, the specific language used in making the point fails to capture an illicit motive. Pettiness is not a crime, and neither is exercising employment at will

terminations for legal reasons, regardless of whether such reasons are logical, illogical, or just plain silly.  Moreover, even accepting Plaintiffs' construction of the passages involved, the article vaguely alludes to improper motives of unfixed meaning so that there is no clear factual implication of a "wrongdoing" beyond what the author of the article might suggest is a moral failing.  In other words, such obvious speculation as to motivation is not a factual statement.

Plaintiffs next argue that the article's reference to Murray as an "extremist" is actionable. They note that the word may at times be employed in a hyperbolic fashion, but argue that the usage here precisely paints Murray, in Plaintiffs' words, "as an unhinged, even dangerous zealot who cares so little about his employees that he would not give a second though to firing them *en masse* just to make a political point."  (ECF No. 25, at Page ID # 222.)  Again, however, this fails to present an actionable statement.  It is not likely that the average reader would understand the use of the word as communicating an objective fact as opposed to presenting a subjective opinion.  The extreme word choice in which Stark engaged in selecting "extremist" is a clear signal of hyperbolic writing as opposed to simply reporting facts.  Accordingly, the first factor does not favor actionability.

### 2. Verifiability

The second factor also weighs against Plaintiffs' case.  This factor requires the Court to examine whether each targeted statement can actually be verified.  This is because, as both the Sixth Circuit and the Ohio Supreme Court have recognized, "if a 'statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content.' " *Bentkowski*, 637 F.3d at 694 (quoting *Scott v. News-Herald*, 25 Ohio St.3d 243, 251-52, 496 N.E.2d 699, 707 (1986)).  Stated otherwise, the Court "seek[s] to determine whether the

allegedly defamatory statements are objectively capable of proof or disproof, for "'a reader cannot rationally view an unverifiable statement as conveying actual facts.' " *Wampler*, 93 Ohio St.3d at 129, 752 N.E.2d at 979 (quoting *Ollman v. Evans*, 750 F.2d 970, 981 (D.C. Cir. 1984)).

Plaintiffs argue that the alleged defamatory statements set forth in the article were packaged to suggest that they are the products of a thorough investigation with substantiating facts. They also contend that because they made other public statements as to why they laid off the miners, any suggestion of other reasons behind the dismissals cannot constitute opinions. Both contentions ignore the effect of Ohio law on this case.

Even assuming *arguendo* that the article implies that Murray acted with an "improper" motive or motives, such a suggestion is not verifiable because there are no objective tests to determine his internal motivation. Murray asserting that political spite was not his motivation because of other public statements is beside this analytic point; the point is that even if Murray understands why he acted, no one else can verify his thought processes and motivation. Even less persuasive is Plaintiffs' argument that expressions of another's motivation are verifiable because the law makes determinations as to employer motivations in employment cases. Plaintiffs are conflating areas of law and distinct tests. In the context of this lawsuit involving the two claims at issue here, the law teaches that objective verification matters.

There is simply no plausible way of testing a possible motivation so that Stark or anyone else could know, and the article does not state or imply otherwise. Stark does not represent in the article that he has private, first-hand knowledge that substantiates the opinion he expresses so as to transform the expression of opinion into a *de facto* assertion of fact. *See Scott*, 25 Ohio St.3d at 251, 469 N.E.2d at 707. Instead, the article's speculation is inherently and

10

unquestionably unreliable and could only be understood as such by the average reader.

Equally not amendable to verification is the description of Murray as an extremist.  This label echoes similarly hyperbolic descriptions that previously failed to constitute actionable statement under Ohio law.  In *Wampler*, for example, the Ohio Supreme Court asked whether various descriptions set forth in a letter to the editor were "subject to proof or disproof upon the application of facts to an accepted legal standard."  93 Ohio St.3d at 129, 752 N.E.2d at 979. The terms employed were of a similar nature as "extremist"; the letter described a rent proposal as "exorbitant," characterized an individual as "ruthless," and described a corporation as "faceless," "mindless," and "heartless."  *Id.*, 752 N.E.2d at 979-80.  The Ohio Supreme Court held that these were all standardless statement not amendable to objective proof or disproof.  *Id.* This same conclusion attaches to the use of "extremist" here.  There is simply no way to verify the label.  Therefore, the second factor also does not support actionability.

### 3.  General and broader context

This leaves for discussion the third and fourth factors involved in the requisite analysis: the general context of the statements and the broader context in which the statements appeared. Tracking the approach employed in *Bentkowski*, this Court shall discuss the general context and broader context factors together.  This pragmatic approach arises from the fact that, as the Sixth Circuit has recognized, "Ohio case law displays some confusion as to what constitutes 'general context' as opposed to 'broader context.' "  *Bentkowski*, 637 F.3d at 695.

The general context is the entire work at issue, while the broader context is the publication in which the work appears.  Analysis of the former context necessitates examining " 'more than simply the alleged defamatory statements in isolation, because the language

11

surrounding the averred defamatory remarks may place the reasonable reader on notice that what is being read is the opinion of the writer.' " *Id.* (quoting *Wampler*, 93 Ohio St.3d at 130, 752 N.E.2d at 980). Thus, Ohio law indicates that "courts should assess 'the entire article or column' because 'unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content.' " *Wampler*, 93 Ohio St.3d at 130, 752 N.E.2d at 980 (quoting *Ollman*, 750 F.2d at 979).

Similar to the statements involved in *Bentkowski*, the statements at issue here "were clearly made in the general context of opinion." 637 F.3d at 695. The article is written in a notably conversational style that explicitly injects the author into the text from nearly the outset. It employs sarcasm ("One might think . . ."), despite Plaintiffs' insistence that it is a serious news article not grounded in sarcasm (or presumably snarkiness as well). It contains outright opinions ("To be clear, neither of these scandals are Whitewater-esque: There really is a 'there' there."). And, as with much contemporary journalism, it engages in the unmasked expression of subjective judgment as opposed to coating itself in a veneer of who-what-where-when objectivity ("sleeping in Star Scientific's bed," "the money trail is damning," "fat envelopes of cash from extreme and unsavory donors," "an extremist billionaire"). The article also concludes with a list of questions meant to target its central, albeit shocking-in-the-most-*Casablanca*-sense, premise that a campaign donor might be expecting something in return for funding a candidate with an apparent history of favoring donors. *See Wampler*, 93 Ohio St.3d at 130, 752 N.E.2d at 980. In other words, the article seeks to stir the pots of public interest and concern by relaying its viewpoint as much if not more than it seeks to inform. This is not to say that the article is devoid of facts. It includes both facts and opinions, presented more as an argument/call for

concern than as an attempt only to engage in the traditional Five Ws of old-school journalism.

In light of these characteristics, the only reasonable view of the article is that "[t]he author makes no attempt to hide his bias, and it would be unreasonable for a reader to view his comments as impartial reporting." *Bentkowski*, 637 F.3d at 695. As in *Bentkowski*, "[t]he author's statements are 'pointed, biting, and tough,' and 'it is apparent that the writer's intent is to persuade readers to his point of view.' " *Id.* (quoting *Condit v. Clermont Cnty. Review*, 110 Ohio App.3d 755, 761, 675 N.E.2d 475, 479 (1996)). The impression the article likely creates in the mind of the average, reasonable reader is that the targeted statements are opinion. The general context of the article therefore disfavors actionability.

The broader context of the article also weighs against Plaintiffs evading dismissal. The Sixth Circuit has explained why the publication in which an article appears is important:

> the Ohio Supreme Court has recognized that "[d]ifferent types of writing have . . . widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion." *Scott*, 496 N.E.2d at 708 (internal quotation marks and citation omitted) (alteration in original). Thus, "we must examine the type of article and its placement in the newspaper and how those factors would influence the reader's viewpoint on the question of fact or opinion." *Id.*

*Bentkowski*, 637 F.3d at 695. Two basic comments are warranted.

First, given the multiple-factor test involved and the weight of all of the other factors against actionability, the Court recognizes that this last factor is perhaps of minimal weight in terms of influencing the ultimate disposition. Second, despite this point, the Court concludes that the fourth factor also weighs just slightly, if it is of any real weight, in favor of dismissal.

Defendants would have this Court take judicial notice that the article at issue appeared on a blog on a website expressly known for its viewpoint journalism. This Court declines to accept

13

such a broad proposition here, but the Court recognizes that The Huffington Post is a publication often linked to vigorous expressions of opinion regarding matters of public concern.  Although Plaintiffs reject categorizing the site as a whole as falling into any of the traditional types of opinion "genres" associated with newspapers (*e.g.*, editorial pages, sports pages), this Court recognizes that the electronic forum involved here and the nature of the publication (a blog as opposed to a news page) may be at times akin to a traditional print newspaper's opinion pages, or at least a sufficiently opinionated cousin, so as to offer some minimal support for dismissal.

This is not to suggest in any way that the mere fact of publication by a blogger on The Huffington Post insulates a defendant from liability.  Of course that can never be true.  Rather, the Court recognizes *only* that in the particular context of the specific article at issue today, written by a blogger in the personalized manner it was and published on a blog with an ideological bent, the average reader would regard the article as an expression of opinion.  The Court emphasizes that the website involved is but one factor considered and can never be singularly dispositive of a defamation issue.

Having considered the totality of the circumstances surrounding the article at issue, the Court concludes that Plaintiffs have failed to present plausible claims upon which this Court can grant relief.  The targeted statements present protected opinions and not actionable statements of fact.  *See Bentkowski*, 637 F.3d at 696 (collecting cases discussing weighing of factors).  This means that this Court need not and does not consider Defendants' alternative arguments for dismissal.  *Id.* (declining to reach alternative grounds for dismissal when after concluding that the Ohio Constitution protected the statements involved in a defamation case).  Defendants are entitled to dismissal of the defamation claim.

Additionally, the same core reasons that necessitate dismissal of the defamation claim inform disposition of the false light invasion of privacy claim, which warrants dismissal as well. *See DeGarmo v. Worthington City Sch. Bd. of Educ.*, No. 12AP-961, 2013 WL 3148430, at *3-4 (Ohio 10th Dist. Ct. App. June 18, 2013).  Under Ohio law a defendant can be liable for false light invasion of privacy even if not liable for defamation.  *Sturdevant v. Likley*, No. 12CA0024-M, 2013 WL 1096176, at *5 (Ohio 9th Dist. Ct. App. Mar. 18, 2013).  But Plaintiffs have presented this Court with no factual allegations that support that Stark's statements of objective facts were knowingly false or that Stark and the other defendants acted recklessly in that regard. Rather, Plaintiffs' second claim hinges on the speculative opinion statements as to Murray's unverifiable motivations being construed as factual representations.  Because this latter proposition is incorrect, as discussed above, dismissal of the second claim is warranted.

### III.  Conclusion

The Court **DENIES** Defendants' requests for oral argument and **GRANTS** their motions to dismiss.  (ECF No. 19, 20.)  The Clerk shall enter judgment accordingly and terminate this case on the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED**.

_____/s/ Gregory L. Frost_____
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE